**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| MATTHEW ROUNER, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. 4:13-cv-02823 |
| | § | |
| CAROLYN W. COLVIN, | § | |
| COMMISSIONER OF SOCIAL | § | |
| SECURITY, | § | |
| Defendant. | § | |

**MEMORANDUM AND RECOMMENDATION ON
MOTIONS FOR SUMMARY JUDGMENT**

This matter was referred by United States District Judge Lee H. Rosenthal, for full pre-trial management, pursuant to 28 U.S.C. § 636(b)(1)(A) and (B). (Docket Entry #3). Cross-motions for summary judgment have been filed by Plaintiff Matthew Rouner ("Plaintiff," "Rouner") and by Defendant Carolyn W. Colvin ("Defendant," "Commissioner"), in her capacity as Commissioner of the Social Security Administration ("SSA"). (Plaintiff's Motion for Summary Judgment ["Plaintiff's Motion"], Docket Entry #13; Defendant's Cross-Motion for Summary Judgment ["Defendant's Motion"], Docket Entry #10). Defendant has filed a response to Plaintiff's Motion, and Plaintiff's response has been included in his motion for summary judgment.(Plaintiff's Motion; Defendant's Reply to Plaintiff's Cross-Motion for Summary Judgment ["Defendant's Response"], Docket Entry #14). After considering the pleadings, the evidence submitted, and the applicable law, it is **RECOMMENDED** that Defendant's Motion be **GRANTED**, and that Plaintiff's Motion be **DENIED**.

1

## Background

On May 27, 2011, Matthew Rouner filed an application[1] for Supplemental Security Income benefits ("SSI"), under Title XVI of the Act. (Transcript ["Tr."] at 168-73). In his application for benefits, Rouner claimed that he had been unable to work since January 1, 2001, due to obsessive compulsive disorder, major depressive disorder, bipolar disorder, agoraphobia,[2] and a social anxiety disorder. (Tr. at 193, 205). On July 27, 2011, the SSA found that Rouner was not disabled under the Act, and it denied his application. (Tr. at 91). Plaintiff petitioned for a reconsideration of that decision, however, his claim was again denied on December 27, 2011. (Tr. at 101-04). He then successfully requested a hearing before an administrative law judge ("ALJ"). (Tr. at 105-07). That hearing took place on August 24, 2012, before ALJ Patricia Henry. (Tr. at 42). Plaintiff appeared and testified at the hearing, and he was accompanied by his attorney, Donald Dewberry ("Mr. Dewberry"). (Tr. at 14). Plaintiff brought three additional witnesses to testify in his behalf; however, there was insufficient time to take their testimony, so the ALJ continued the hearing to a later date. (Tr. at 27). Rouner's second hearing, also before ALJ Patricia Henry, took place on November 2, 2012. (Tr. at 71). Plaintiff appeared, again accompanied by Mr. Dewberry. Rouner's witnesses did not appear, but the ALJ left the record open for three days to allow Plaintiff to submit affidavits from those witnesses. (Tr. at 72, 87). The ALJ also heard testimony from Tom King, ("Mr. King"), a vocational expert witness. (*Id.*). No medical experts testified at either hearing.

---

[1]It is undisputed that Plaintiff's protective filing date is May 18, 2011. (*See* Tr. at 27, 183).

[2]"Agoraphobia" is an anxiety disorder characterized by a fear of being in an open, crowded, or public place, where escape is perceived as difficult or help not available in case of sudden incapacitation. Treatment consists of antianxiety medication and psychotherapy to uncover the cause of the phobic reaction and, more commonly, behavior therapy. If untreated, fear and avoidance behavior dominate life, and the person refuses to leave home. MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY 207, 51 (5th ed. 1998).

On November 20, 2012, the ALJ engaged in the following five-step, sequential analysis to determine whether Plaintiff was capable of performing substantial gainful activity or was, in fact, disabled:

1.  An individual who is working or engaging in substantial gainful activity will not be found disabled regardless of the medical findings. 20 C.F.R. §§ 404.1520(b) and 416.920(b).

2.  An individual who does not have a "severe impairment" will not be found to be disabled. 20 C.F.R. §§ 404.1520(c) and 416.920(c).

3.  An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will not be considered disabled without consideration of vocational factors. 20 C.F.R. §§ 404.1520(d) and 416.920(d).

4.  If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made. 20 C.F.R. §§ 404.1520(f) and 416.920(f).

5.  If an individual's impairment precludes performance of his past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed. 20 C.F.R. §§ 404.1520(g) and 416.920(g).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *Martinez v. Chater*, 64 F.3d 172, 173-74 (5th Cir. 1995); *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991); *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988). It is well-settled that, under this analysis, Rouner has the burden to prove any disability that is relevant to the first four steps. *Wren*, 925 F.2d at 125. If he is successful, the burden then shifts to the Commissioner, at step five, to show that he is able to perform other work that exists in the national economy. *Myers v. Apfel,* 238 F.3d 617, 619 (5th Cir. 2001); *Wren*, 925 F.2d at 125. "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis." *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

It must be emphasized that the mere presence of an impairment does not necessarily establish a disability. *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986)). An individual claiming SSI benefits under the Act has the burden to prove that he suffers from a disability. *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985). Under the Act, a claimant is deemed disabled only if he demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than twelve months." *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990) (citing 42 U.S.C. § 423(d)(1)(A)). Substantial gainful activity is defined as "work activity involving significant physical or mental abilities for pay or profit." *Newton*, 209 F.3d at 452. A physical or mental impairment is "an impairment that results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983) (citing 42 U.S.C. § 423(d)(3)). Further, the impairment must be so severe as to limit the claimant so that "[]he is not only unable to do [his] previous work but cannot, considering [his] age, education, and work experience, engage in any kind of substantial gainful work which exists in the national economy." *Greenspan*, 38 F.3d at 236 (citing 42 U.S.C. § 423(d)(2)(A)).

Based on these principles, as well as her review of the evidence presented at the hearing, the ALJ determined that Plaintiff "has not engaged in substantial gainful activity since May 18, 2011." (Tr. at 29). The ALJ further concluded that Rouner suffered from "depression/dysthymic[3] disorder,

---

[3]"Dysthymic disorder" is a mood disorder in which the essential feature is a chronic disturbance of mood of at least two years' duration. The disorder involves either depressed mood, or anhedonia, but not of sufficient severity and duration to meet the criteria for a major depressive episode. MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY 207, 527 (5th ed. 1998).

anxiety, and obsessive compulsive disorder." (*Id.*). Although she determined that these impairments, alone and in combination are severe, she concluded, ultimately, that Plaintiff's impairments do not meet, or equal in severity, the medical criteria for any disabling impairment in the applicable SSA regulations.[4] (*Id.*). The ALJ also found that Rouner has the RFC to perform "a full range of [unskilled] work at all exertional levels[,]" however she limited Plaintiff to "occasional interaction with supervisors, co-workers, and members of the general public[.]" (Tr. at 31). Based on Mr. King's testimony, the ALJ determined that, although Rouner has no past relevant work history, he can perform such jobs as a laundry worker, a packager, and an office cleaner, and that such work exists in significant numbers in the national economy. (Tr. at 34). For that reason, the ALJ concluded that Rouner is "not [] under a 'disability,' as defined in the Act," and she denied his application for benefits. (Tr. at 35).

On January 10, 2013, Plaintiff requested an Appeals Council review of the ALJ's decision. (Tr. at 23). SSA regulations provide that the Appeals Council will grant a request for a review if any of the following circumstances is present: "(1) there is an apparent abuse of discretion by the ALJ; (2) an error of law has been made; (3) the ALJ's actions, findings, or conclusions are not supported by substantial evidence; or (4) there is a broad policy issue which may affect the public interest." 20 C.F.R. §§ 404.970 and 416.1470. On July 17, 2013, the Appeals Council denied Rouner's request, concluding that no reason for review existed under the regulations. (Tr. at 1). With that ruling, the ALJ's decision became final. *See* 20 C.F.R. §§ 404.984(b)(2) and 416.1484(b)(2). On September 19, 2013, Plaintiff filed this lawsuit, pursuant to section 205(g) of the Act (codified as

---

[4] A claimant is presumed to be "disabled" if his impairments meet, or equal in severity, a condition that is listed in the appendix to the Social Security regulations. *Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994).

amended at 42 U.S.C. § 405(g)), to challenge that decision. (Complaint, Docket Entry #1). Subsequently, the parties filed cross-motions for summary judgment. Having considered the pleadings, the evidence submitted, and the applicable law, it is recommended that Defendant's motion for summary judgment be granted, and that Plaintiff's motion for summary judgment be denied.

**Standard of Review**

Federal courts review the Commissioner's denial of disability benefits only to ascertain whether the final decision is supported by substantial evidence and whether the proper legal standards were applied. *Newton*, 209 F.3d at 452 (citing *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999)). "If the Commissioner's findings are supported by substantial evidence, they must be affirmed." *Id.* (citing *Martinez*, 64 F.3d at 173). "Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. It is more than a mere scintilla and less than a preponderance." *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *see Martinez*, 64 F.3d at 173 (quoting *Villa v. Sullivan*, 895 F.2d 1019, 1021-22 (5th Cir. 1990)). On review, the court does not "reweigh the evidence, but . . . only scrutinize[s] the record to determine whether it contains substantial evidence to support the Commissioner's decision." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *see Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987). If no credible evidentiary choices or medical findings exist that support the Commissioner's decision, then a finding of no substantial evidence is proper. *Johnson*, 864 F.2d at 343.

**Discussion**

Before this court, Plaintiff challenges the ALJ's decision on four grounds. In his first argument, Plaintiff maintains that the ALJ denied him due process of law. Specifically, Rouner

claims that the ALJ did not allow his witnesses to testify; that she scheduled the supplemental hearing at a time when his witnesses could not attend; and that she improperly limited his attorney's cross-examination of the vocational expert witness. (Plaintiff's Motion at 6-8). Next, Plaintiff alleges that the ALJ erred in finding that he did not follow his prescribed treatment, and that she failed to comply with SSR 82-59, which dictates that she follow certain procedures if noncompliance forms the basis for a denial of benefits. (*Id.* at 10). Third, Rouner contends that the ALJ improperly evaluated the opinion from Dr. Mohamed Ahmed, his treating psychiatrist, who spoke to his "inability to engage in competitive employment." (*Id.* at 13). Finally, Plaintiff insists that the ALJ's RFC assessment is not supported by substantial evidence, because she failed to determine whether he has the ability to sustain employment, even if he could obtain it. (*Id.* at 13-14). Defendant is adamant, however, that the ALJ properly considered all of the available evidence, and that she followed the applicable law, in determining that Plaintiff is not disabled. (Defendant's Motion at 4-7; Defendant's Response at 2-3, 4-6).

### *Medical Facts, Opinions, and Diagnoses*

On August 31, 2004, Plaintiff saw Dr. Carmen Wong ["Dr. Wong"], a family practitioner. (Tr. at 246). Rouner reported that he had been having difficulty falling asleep, as well as experiencing crying spells. He stated that he was depressed, but he denied having any suicidal ideation or plans. (*Id.*). During her examination, Dr. Wong observed that Plaintiff's mood and affect were depressed; that he had obsessive compulsive behaviors; and that he exhibited some paranoia. She also noted that he strongly objected to meeting new people. (*Id.*). Dr. Wong ultimately diagnosed Rouner as suffering from depression and anxiety, and she prescribed 10 mg of Lexapro. (*Id.*).

7

Four years later, on September 30, 2008, Plaintiff saw Dr. Wong again, complaining of anxiety attacks. (Tr. at 244). He reported that those attacks had become more intense within the last year. Rouner also stated that he had been taking Lexapro, and that the medication had been providing "mild help." (*Id.*).

On October 30, 2008, Rouner met with Dr. Mohamed Ahmed ["Dr. Ahmed"], a psychiatrist. (Tr. at 344). At that visit, Plaintiff appeared to suffer from anxiety, depression, and obsessive compulsive behavior. His symptoms included a choking or smothering sensation, dry-mouth, a fear of dying, a feeling of impending doom, hyperventilation, light-headedness, chest palpitations, paresthesias,[5] increased perspiration, shortness of breath, tachycardia,[6] generalized tension, nervousness, somatic pains, muscle tension, recurrent intrusive thoughts, compulsive acts, anxiety, decreased appetite, crying spells, sadness, and indecisiveness. (*Id.*). During his examination, Dr. Ahmed noted that Rouner's thought process was normal, that he did not suffer from hallucinations, delusions, or obsessions, and that he was responding well to Lexapro. (Tr. at 345). He ultimately diagnosed Plaintiff as suffering from generalized anxiety, depression, and obsessive compulsive disorder. Dr. Ahmed increased Rouner's dose of Lexapro to 20 mg, and he prescribed Ativan to treat his anxiety. He also instructed Plaintiff to call if he developed new, or worsened symptoms, and to schedule a follow-up appointment in two weeks. (*Id.*).

On June 5, 2009, Rouner had another appointment with Dr. Wong. (Tr. at 243). At that visit,

---

[5]"Paresthesia" refers to any subjective sensation, experienced as numbness, tingling, or a "pins and needles" feeling. MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY 207, 1209 (5th ed. 1998).

[6]"Tachycardia" is a condition in which the mycardium contracts at a rate greater than 100 beats/min. The heart rate normally accelerates in response to fever, exercise, or nervous excitement. Tachycardia acts to increase the amount of oxygen delivered to the cells of the body by increasing the amount of blood circulated through the vessels. MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY 207, 1584 (5th ed. 1998).

he stated that he had been suffering from insomnia for the past two months, and that he continued to have anxiety attacks. He reported taking Lexapro and Ativan, but he made no comment on the effectiveness of either medication. (*Id.*).

On September 18, 2009, Plaintiff again saw Dr. Ahmed, and he complained of generalized anxiety and panic attacks. (Tr. at 251). Plaintiff described symptoms, which, again, included apprehension, chest pain, a choking or smothering sensation, dry-mouth, a fear of dying, a feeling of impending doom, hyperventilation, light-headedness, chest palpitations, paresthesias, increased perspiration, shortness of breath, tachycardia, generalized tension, nervousness, somatic pains, muscle tension, recurrent intrusive thoughts, and compulsive acts. He explained that he experienced these symptoms about once a month. (*Id.*). Rouner also reported a decreased appetite and increased indecisiveness. Plaintiff denied having recurrent flashbacks, nightmares, anhedonia,[7] crying spells, fatigue, guilt, feelings of worthlessness, or weight change. (*Id.*). Dr. Ahmed noted that Rouner was responding well to Lexapro, but that he continued to have problems falling asleep. He ultimately diagnosed Rouner as suffering from mild depression. (*Id.*). Dr. Ahmed recommended that Plaintiff avoid caffeine, and that he continue taking the Lexapro. (Tr. at 252). He also suggested that Rouner reduce his stress level, that he increase his physical activity, that he join a support group, and that he resume social interaction. (*Id.*). Dr. Ahmed advised Rouner to call if he developed new or worsening symptoms, and to schedule a follow-up appointment in two weeks. (*Id.*).

On January 25, 2010, Rouner had another appointment with Dr. Ahmed. (Tr. at 256). Plaintiff reported experiencing apprehension, generalized tension, nervousness, somatic pains,

---

[7]"Anhedonia" refers to the inability to feel pleasure or happiness in response to experiences that are ordinarily pleasurable. It is often a characteristic of major depression. MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY 207, 93 (5th ed. 1998).

muscle tension, and sleep problems. Rouner said that these symptoms occurred several times each week, and that, recently, they had been increasing in frequency and intensity. (*Id.*). Plaintiff stated that his panic attacks were triggered by crowds or public places. Rouner denied, however, experiencing any chest pain, choking sensations, fear of dying, hyperventilation, insomnia, palpitations, paresthesias, increased perspiration, shortness of breath, recurrent intrusive thoughts or compulsive acts, persistent sadness, anhedonia, change in appetite, fatigue, or feelings of worthlessness. (*Id.*). Plaintiff stated that he had discontinued the Lexapro for one month. He explained that he had resumed the dosage two weeks earlier, however, and that his symptoms had already improved. (*Id.*). Dr. Ahmed reported that Rouner had failed to comply with follow-up appointments, as recommended, and that he had not started counseling. Apparently, Plaintiff also told Dr. Ahmed that  he would not be able to continue taking Lexapro, due to his finances. During the examination, Dr. Ahmed observed that Plaintiff's memory, attention, and concentration were intact, and that his mood and affect were appropriate. (Tr. at 257). He determined that Rouner was experiencing mild depression, and that his depressive symptoms were fairly infrequent. (Tr. at 256). At that visit, Dr. Ahmed discontinued the Lexapro, and prescribed 20 mg of Celexa to treat Plaintiff's anxiety. (Tr. at 257). He also recommended that Rouner reduce his stress levels, increase his physical activity, contact a support group, resume social interaction, and schedule a follow-up appointment in two weeks. (Tr. at 257, 258).

On April 29, 2010, Plaintiff did follow-up with Dr. Ahmed. (Tr. at 259). Rouner's symptoms had not changed from his January visit, however, he reported being slightly more restless on Celexa. (Tr. at 259). Rouner told the doctor that he had been out of his medications for several months, and that he had been suffering from panic attacks on a weekly basis. Dr. Ahmed noted that Rouner had

major social anxiety, and that, as a result, he would not attend a follow-up appointment without his

mother. (*Id.*).He also reported that Plaintiff experienced mood lability, that he cleaned obsessively

for over twenty-four hours, at least once a week, and that, while his depressive symptoms occurred

intermittently, they were "present about half of the time." (*Id.*). Dr. Ahmed discontinued the Celexa,

and prescribed Fluvoxamine to treat Plaintiff's obsessive compulsive disorder and social phobia. He

also prescribed Thorazine to stabilize Plaintiff's mood. (Tr. at 261).

On May 14, 2010, when Rouner next saw Dr. Ahmed, he reported that his symptoms had not

changed. However, he told the doctor that he had obtained his medication only two days earlier. (Tr.

at 262). Dr. Ahmed then referred Rouner to an individual psychotherapist. He also instructed him

to continue taking his medication, as prescribed, and he recommended that he schedule a follow-up

appointment in two weeks. (Tr. at 264-65).

On June 8, 2010,  Plaintiff had another appointment with Dr. Ahmed. During that visit, Dr.

Ahmed noted that Rouner's anxiety was mostly controlled,[8] and that he was taking only Ativan, as

needed. (Tr. at 265). At that time, Plaintiff had not started psychotherapy. (*Id.*). Rouner told Dr.

Ahmed that his mood had been "in the middle[,]" that he had been neither happy, nor sad, and that

he had been taking his medications inconsistently, because they caused drowsiness. (*Id.*). During

his examination, Dr. Amhed observed that Plaintiff's mood, affect, and demeanor were appropriate,

and that his thought processes, and content, were normal. (Tr. at 266). Dr. Ahmed, again, referred

Rouner to an individual psychotherapist. He discontinued the Fluvoxamine, but restarted the

Lexapro to treat Plaintiff's obsessive compulsive disorder. (Tr. at 267). He also discussed the

---

[8]Within the same notes, Dr. Ahmed states that Rouner's symptoms occur "several times per week[,]" and
that they are "increasing in frequency and intensity." (Tr. at 265).

importance of medication compliance, and he gave Plaintiff samples of Lexapro at that visit. (*Id.*).

On June 29, 2010, Rouner returned to Dr. Ahmed, and he stated that he was pleased with the Lexapro, but he was unhappy with the Thorazine. (Tr. at 268). He said that the Thorazine caused tingling and numbness in his arm, and that it interfered with his ability to focus. Plaintiff also stated that he would prefer mood swings to the side effects of Thorazine. Rouner's mother reported seeing some "hypo-manic features," however, she did not elaborate. (*Id.*). Plaintiff said that he was excited about moving into his own apartment, but that he was afraid that he might "crash" after the move. He also reported that his sleep had been highly variable, between three and fifteen hours a day. (*Id.*). Dr. Ahmed discontinued the Thorazine, and he prescribed Lamictal to stabilize Plaintiff's mood. (Tr. at 270). He also instructed Rouner to continue taking the Lexapro, as prescribed, and he gave him samples of Lexapro, and Lamictal. He recommended a follow-up appointment in three weeks. (*Id.*).

On July 22, 2010, Plaintiff saw Dr. Ahmed, and reported that his anxiety had been mostly controlled, and that he had been taking the Ativan about once a week.  (Tr. at 271). He stated that he had had a panic attack on the day that he moved into his apartment, and that he had been attempting social situations that he would have previously avoided. (*Id.*). Plaintiff told Dr. Ahmed that he had not started taking the Lamictal, because he was "worried about his move[,]" and that his sleep pattern had not improved. (*Id.*). Dr. Ahmed instructed Rouner to begin taking the Lamictal that evening, and he, again, discussed the importance of taking his medication, as prescribed. (Tr. at 273). He again gave Rouner samples of Lexapro at that visit. (*Id.*).

On August 24, 2010, Rouner had another appointment with Dr. Ahmed. Plaintiff stated that his anxiety was well controlled, that he had been taking the Ativan sparingly, and that he had been having fewer panic attacks since starting the Lamictal. (Tr. at 274). He also stated that he felt more

12

stable, but he reported feeling "down" when his bills are due. His mother stated that he did well on the Lamictal, initially, but that his mood has been "low" for the past two weeks. (*Id.*). Rouner said that he continues to clean obsessively, and that he repeatedly "checks his appliances." Neither Rouner, nor his mother, asked Dr. Ahmed to alter his medication. (*Id.*). Dr. Ahmed instructed Plaintiff to continue taking his medication, as prescribed, and he said that he would consider increasing the Lexapro dosage at the next visit. (Tr. at 276).

On July 29, 2011, Dr. Merrill P. Anderson, Ph.D, ["Dr. Anderson"], a licensed psychologist, acting on behalf of the state, performed a mental status exam on Rouner. (Tr. at 284-86). Plaintiff reported that he was the younger of two siblings, that he is single, that he has never been married, and that he has no children. (Tr. at 284). He stated that he passed the GED test, at the age of 22, after dropping out of the 12th grade. He further stated that he completed a training course for massage therapy, but that he had never obtained a certificate or license. (*Id.*). Rouner said that he was currently unemployed, and that his work history included jobs as a physical therapy assistant for a chiropractor, and an arcade machine mechanic at Celebration Station. He explained that he quit his job at Celebration Station, because he "couldn't be around that many people." (*Id.*). Rouner said that he was not currently receiving mental health treatment, but that he had been prescribed Ativan, Lamictal, and Lexapro, in the past, and that he last took those medications one year ago. Dr. Anderson noted that Plaintiff had no history of psychiatric hospitalization, however, he had some history of psychological counseling. Rouner denied both current and historical substance abuse. (*Id.*). Rouner described his symptoms, which included irritability, suicidal ideation without intent or plans, crying spells, reduced motivation, feeling "flushed[,]" shaking, agitation, gastrointestinal disturbance, constant organizing, labeling, and symmetrical obsessions. (Tr. at 285). He also

reported experiencing depression, long term interpersonal distrust, and "interpersonal sensitivity." (*Id.*). Rouner said that he performs a full range of household chores, independently, and that his daily activities include watching television, playing computer games, and "surfing" the internet. He stated that he has a driver's license, however, his father drove him to the appointment. He also said that he is able to bathe and dress himself, without assistance. (*Id.*). During his examination, Dr. Anderson observed that Rouner's immediate memory appeared to be consistent with his estimated intellectual ability; that his short-term memory was marginal; that his long-term memory appeared to be fair; that his concentration and attention appeared to be fair; that his insight appeared to be fair; and that his judgment appeared to be in the low-average range. (*Id.*). Ultimately, Dr. Anderson diagnosed Rouner as suffering from dysthymia, obsessive compulsive disorder, and an anxiety disorder, not otherwise specified. (Tr. at 286). On that date, he ascribed to Rouner a GAF score of 55.[9] (*Id.*). Dr. Anderson concluded that Rouner's mental health issues may improve with consistent treatment. He also found that, if assigned benefits, Plaintiff would be able to manage his funds. (*Id.*).

On July 26, 2011, Dr. Charles Lankford, Ph.D ["Dr. Lankford"], a psychologist, also acting on behalf of the state, signed a SSA Psychiatric Review Technique Form ("PRTF"). (Tr. at 287-99). After reviewing the medical evidence, Dr. Lankford found that Plaintiff suffered from depression, dysthymic disorder, anxiety, and obsessive compulsive disorder. (Tr. at 290, 292). He further found,

---

[9]The GAF scale is used to rate an individual's "overall psychological functioning." AMERICAN PSYCHIATRIC INSTITUTE, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM-IV") 32 (4th ed. 1994). The scale ascribes a numeric range from "1" ("persistent danger of severely hurting self or others") to "100" ("superior functioning") as a way of categorizing a patient's emotional status. *See id.* A GAF score in the "51 to 60" range indicates moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers) OR moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks). *Id.* at 34.

however, that his impairments did not satisfy the criteria found in the 12.04 listing[10] on Affective

Disorders, or the 12.06 listing[11] on Anxiety-Related Disorders. (*Id.*). In assessing his functional

---

[10]Listing 12.04 requires a showing of the following conditions:
A. Medically documented persistence, either continuous or intermittent, of one of the following:
    1. Depressive syndrome characterized by at least four of the following:
        a. Anhedonia or pervasive loss of interest in almost all activities; or
        b. Appetite disturbance with change in weight; or
        c. Sleep disturbance; or
        d. Psychomotor agitation or retardation; or
        e. Decreased energy; or
        f. Feelings of guilt or worthlessness; or
        g. Difficulty concentrating or thinking; or
        h. Thoughts of suicide; or
        i. Hallucinations, delusions or paranoid thinking . . . [and]
B. Resulting in at least two of the following:
        a. Marked restriction in activities of daily living; or
        b. Marked difficulties in maintaining social functioning; or
        c. Marked difficulties in maintaining concentration, persistence, or pace; or
        d. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Part 404, Subpt. P. Appendix 1 § 12.04.

[11]Listing 12.06 requires a showing of the following conditions:
A. Medically documented findings of at least one of the following:
    1. Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:
        a. Motor tension; or
        b. Autonomic hyperactivity; or
        c. Apprehensive expectation; or
        d. Vigilance and scanning
    OR
    2. A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or
    3. Recurrent severe panic attacks manifested y a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or
    4. Recurrent obsessions or compulsions which are a source of marked distress; or
    5. Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress;
    AND
B. Resulting in at least two of the following:
    1. Marked restriction in activities of daily living; or
    2. Marked difficulties in maintaining social functioning; or
    3. Marked difficulties in maintaining concentration, persistence, or pace; or
    4. Repeated episodes of decompensation, each of extended duration.
    OR
C. Resulting in complete inability to function independently outside the area of one's home.

20 C.F.R. Part 404, Subpt. P. Appendix 1 § 12.06.

limitations under the criteria in paragraph B, Dr. Lankford found that Plaintiff had mild restrictions in his daily activities; a moderate limitation in his ability to maintain social functioning; and a moderate limitation in his ability to maintain concentration, persistence or pace. (Tr. at 297). He also found that he had experienced no episodes of decompensation of extended duration. (*Id.*). He further found that the evidence did not establish the presence of paragraph C criteria. (Tr. at 298). Dr. Lankford ultimately concluded that the alleged severity and limiting effects of Rouner's impairments are not wholly supported by the medical evidence. (Tr. at 299). On December 13, 2011, that PRTF was affirmed, as written, by Dr. Michael O'Callaghan, Ph.D ["Dr. O'Callaghan"], another psychologist retained by the state. (Tr. at 305).

On July 26, 2011, Dr. Lankford also prepared an evaluation of Rouner's mental residual functional capacity, on behalf of the state. (Tr. at 301-03). After reviewing the medical evidence, Dr. Lankford made several observations. Under the category of "Understanding and Memory," he noted that Plaintiff's ability to remember locations and work-like procedures was "not significantly limited;" that his ability to understand and remember short and simple instructions was "moderately limited;" and that his ability to understand and remember detailed instructions was "markedly limited." (Tr. at 301). Under the category of "Sustained Concentration and Persistence," Dr. Lankford found that Plaintiff was "markedly limited" in his ability to carry out detailed instructions. (*Id.*). He also noted that he was "moderately limited" in his ability to maintain attention and concentration for extended periods; in his ability to carry out short and simple instructions; in his ability to complete a normal workweek without interruptions from his impairments; and in his ability to work in coordination or proximity with others without being distracted by them. (Tr. at 301, 302). Dr. Lankford concluded, however, that Rouner was "not significantly limited" in his ability to

sustain an ordinary routine without special supervision; in his ability to make simple work-related decisions; or in his ability to perform activities within a schedule; maintain regular attendance; and be punctual (Tr. at 301). Under the category of "Social Interaction," Dr. Lankford found that Plaintiff was "moderately limited" in his ability to interact appropriately with the general public, but that he was "not significantly limited" in any of the other subcategories listed. (Tr. at 302). Under the category of "Adaptation," Dr. Lankford found that Plaintiff was "moderately limited" in his ability to respond appropriately to changes in the work setting, and in his ability to travel in unfamiliar place, or use public transportation; however, he concluded that Rouner was "not significantly limited" in any other subcategories listed. (*Id.*). On December 13, 2011, that mental residual functional capacity assessment was affirmed, as written, by Dr. O'Callaghan. (Tr. at 307).

On August 26, 2012, Dr. Ahmed prepared an evaluation of Rouner's mental residual functional capacity. (Tr. at 356-60). Dr. Ahmed's clinical findings showed that Rouner suffered from high anxiety, accompanied by panic attacks and social withdrawal, constant depressive symptoms, and sleep disturbances. (Tr. at 357). He described Plaintiff's symptoms, which included appetite disturbance with weight change, generalized persistent anxiety, mood disturbance, difficulty thinking or concentrating, persistent mood or affect disturbances, recurrent obsessions or compulsions, emotional withdrawal or isolation, emotional lability, sleep disturbances, and recurrent, severe panic attacks. (*Id.*). Under the category of "Mental Abilities and Aptitudes Needed to Do Unskilled Work," Dr. Ahmed found that Rouner was "limited, but satisfactory" in his ability to understand and remember very short and simple instructions; in his ability to carry out very short and simple instructions; in his ability to make simple work-related decisions; and in his ability to ask simple questions or request assistance. (Tr. at 358). He also found that he was "seriously limited,

but not precluded," from remembering work-like procedures; maintaining attention for two-hours; maintaining regular attendance; sustaining a regular routine without special supervision; working in coordination with, or in proximity to others, without being unduly distracted; completing a normal workday or workweek without interruptions from psychologically based symptoms; accepting instructions and responding appropriately to criticism from supervisors; getting along with co-workers or peers; responding appropriately to changes in routine work setting; and dealing with normal work stress. (*Id.*). Under the category of "Mental Abilities and Aptitudes Needed to Do SemiSkilled and Skilled Work," Dr. Ahmed found that Plaintiff was "seriously limited, but not precluded," from understanding and remembering detailed instructions; carrying out detailed instructions; setting realistic goals or making plans independently of others; and dealing with stress of semiskilled and skilled work. (Tr. at 359). Under the category of "Mental Abilities and Aptitude Needed to Do Particular Types of Jobs," he found that Rouner was "seriously limited, but not precluded," from interacting appropriately with the general public; maintaining socially appropriate behavior; adhering to basic standards of cleanliness; traveling in unfamiliar places; and using public transportation. (*Id.*). Dr. Ahmed stated that Plaintiff's impairments would cause him to miss about four days of work, per month, and that he is unable to obtain his prescriptions, because of their high cost and his lack of insurance coverage. (Tr. at 356, 360).

### *Educational Background, Work History, and Present Age*

At the time of the hearing, Rouner was 30 years of age, and he had obtained a GED. (Tr. at 45). Plaintiff testified that his past relevant work included his job as an arcade mechanic at Celebration Station, and his job as a massage therapist.  (Tr. at 46, 60). He stated, however, that the massage therapy studio "asked [him] to leave[,]" because he was unable to cope with meeting new

people, and that he was very afraid to be around people. (Tr. at 60).

### *Subjective Complaints*

In his application for benefits, Rouner claimed that he has been unable to work since January 1, 2001, due to obsessive compulsive disorder, major depressive disorder, bipolar disorder, agoraphobia, and social anxiety disorder. (Tr. at 193, 205). He explained that, as a result of these impairments, he has difficulty in leaving his house. (Tr. at 233). Rouner reported that his daily activities included feeding and playing with his cats, "surf[ing]" the computer, playing video games, watching television, reading books, and "sit[ting] around." (Tr. at 234, 237). He also said that he has never been able to "handle new people[,]" and that he is "constantly" stressed. (*Id.*). He reported no problems in managing his personal care needs, but that he required reminders to take his medication. (Tr. at 234-35). Rouner said that he prepares his own meals, and that he cleans and organizes his house, twice a day, for thirty minutes at a time. (Tr. at 235). He also said that he is able to drive, shop, and handle his finances. (Tr. at 236). He stated that he does not go out very often, and that he must be accompanied by someone, when he does go out. (Tr. at 237-38). He stated that he can pay attention "[for a long time,] if [he is] interested [in the subject;]" that he follows written instructions fairly well, and that he follows oral instructions "pretty well." (*Id.*). He said that he gets along with authority figures fairly well, but that he has been fired, because he could not get along with his supervisor. (Tr. at 239). He also said that he does not handle stress well, nor does he manage changes in routine well either. (*Id.*). Finally, he reported that his sleep pattern is erratic, and that he fears becoming homeless. (*Id.*).

At the first hearing, Rouner testified to the severity and debilitating effects of the mental impairments from which he suffers. (Tr. at 47-68). He said that he has trouble being around people,

and that he is constantly worried about his safety. (Tr. at 47). He stated that he has panic attacks when he is given a task, because he is "very afraid of failure[.]" (*Id.*). Rouner testified that he had panic attacks when his father dropped him off at school, and that he would then walk home after his father left. (Tr. at 53). He also said that he was very anxious about school, and that he was unable to focus on his work, which resulted in poor academic performance. (*Id.*). He stated that he had two or three friends in high school, and that he was involved with the theater department and the drama club. (Tr. at 55). Rouner testified that he had a girlfriend for three years, but that he has not had any other significant romantic relationships. (Tr. at 56-57). He also said that he is "afraid of eggs[,]" and "of going out in[to] the world[.]" (Tr. at 56, 62). He explained that it takes him four or five hours to "work up the nerve" to leave his apartment. (Tr. at 63). He stated that he cleans the counters at his home three or four times, daily, and that he washes his hands six or seven times, daily. (Tr. at 57). Rouner said that he is very anxious around crowds, and that he calls his family members repeatedly, if he is unable to contact them. (Tr. at 58). He also stated that he had been seeing a psychiatrist for three years, but that he had only been able to see him once in the past year, because of financial issues. (Tr. at 47). He testified that he lives independently, prepares his own meals, and that he drives himself to the grocery store "once every two weeks[,]" and to his mother's house "if [she] needs [him] for something." (Tr. at 47-48, 50). He further testified that he purchases the same groceries at every visit. (Tr. at 60). He stated that he does not attend church, and that he does not belong to any groups, clubs, or organizations. (Tr. at 50). Rouner told the ALJ that he dusts, sweeps, and mops, every day, and that he does the dishes, laundry, and takes out the trash. (Tr. at 48). He also said that he watches television for five or six hours, a day, that he "surfs" the internet, and plays computer games for six to ten hours, a day, and that he reads one chapter novel, monthly. (Tr. at 49).

20

*Expert Testimony*

At second hearing, the ALJ heard testimony from Mr. King, a vocational expert. (Tr. at 73-77). The ALJ considered Plaintiff's previous work experience, and she explained that none of Rouner's prior work amounted to substantial gainful activity. (Tr. at 93). The ALJ then posed the following questions to Mr. King:

Q        Assume a hypothetical individual with this claimant's age, education, training and work experience who has no exertional limitations[,] but is limited to occasional interaction with supervisors, coworkers, members of the general public[,] and is limited to unskilled work. Are there jobs in the local and national economy that such [an] individual could perform?

A        Yes. . . there would be jobs at the medium, unskilled work base that a person could perform. Three examples [are] laundry worker. . . around 6,000 in the region[]. . . and 400,000 [in the nation] packager . . . 4,000 . . . in the region[], for the nation[] there would be 450,000. . . [and] office cleaner . . . 1,000. . . in the region[], for the nation[] there would be 195,000.

Q        Now[,] same hypothetical[,] except that an individual is limited to a light range of work. Could you give me three jobs for this hypothetical?

A        Yes. Three examples at the light, unskilled work base. . . would be a laundry sorter . . . 1,000. . . in the region[], for the nation[] there would be 265,000. . . shipping weigher . . . 1,000 . . . in the region[], for the nation[] there would be 195,000. . . [and] office cleaner . . . 3,000 . . . in the region[], for the nation[] there would be 380,000.

21

Q      And if you would[,] give me three sedentary jobs with the other limitations as indicated in the first two hypotheticals.

A      Yes, ma'am. Three examples at the sedentary, unskilled work base [would be] a sorter . . . 800 . . . in the region[], for the nation[] there would be 145,000 . . . assembler . . . 900. . . in the region[], for the nation[]there would be 175,000, [and] a document preparer . . . 800 . . . in the region[], for the nation[] there would be 145,000.

* * *

Q      If an individual consistently and routinely exceeded [the] customary limitations [for absences, rest breaks, and time on task expectations] for any reason . . . that would eliminate the jobs that you provided, as well as jobs in the competitive work place?

A      Yes, that would eliminate all jobs with those limitations. (Tr. at 73-75).

Plaintiff's attorney then cross-examined Mr. King, eliciting the following testimony:

Q      [A]ssume that the hypothetical individual would be absent for more than four days per month on a routine basis. Would there be any jobs in the national economy that any claimant could work eight hours a day, five days a week, fifty-two weeks a year?

A      No, sir, with those absences there would be no work.

Q      Assume that a hypothetical individual has a fear of interaction with others and cannot work around, and cannot work with coworkers, supervisors, and the public. Would there be any jobs in the national economy such an individual could perform?

A      No, If he couldn't - - if he had a fear of. . . work[ing] with others - - . . . no.

Q      Now assume. . . that the hypothetical individual has a significant fear of being evaluated and criticized to the extent [that] if he was criticized or evaluated in a negative

22

manner[,] he would retreat from the situation and probably leave. . . the work premises. How would that affect his ability to maintain employment eight hours a day, five days a week, fifty-two weeks a year?

A      If that situation came up and he had to leave work, I would say more than two times, then he could not maintain the work.

* * *

Q      Now assume that the hypothetical individual could not remember work like procedures two hours out of an eight-hour workday. Would there be any jobs in the national economy such an individual could perform?

A      No, there would be no work based on those limitations.

Q      Assume that the hypothetical individual could not maintain attention and concentration for a two-hour segment during an eight-hour workday.

ALJ      Well that has been asked and answered.

* * *

Q      Now assume that the hypothetical individual cannot for two hours a day sustain an ordinary routine without special supervision, would there be any jobs in the national economy      such an individual could perform?

A      If he had to be supervised by his. . . supervisor every day for two hours, no, there would be no work.

Q      Assuming that for two hours per day[,] the hypothetical individual could not accept instructions, can't respond appropriately to criticism from supervisors. . . [w]ould there be any jobs in the national economy such an individual could perform?

23

A        No, sir.

\* \* \*

Q        Assume that the hypothetical individual could not maintain socially appropriate

behavior for two hours per day in the normal eight-hour workday[,] on the job for eight hours

a day, five days a week. Would there be any jobs in the national economy such an individual

could perform that you are aware of?

A        If he demonstrated inappropriate work or social behaviors, no. (Tr. at 76-87).

Following that testimony, the ALJ stated that the record would be left open for three days

to allow Plaintiff to submit affidavits from his absent witnesses. (Tr. at 87).

### *The ALJ's Decision*

Following the hearing, the ALJ made written findings on the evidence. From her review of

the record, she determined that Rouner suffered from "depression/dysthymic disorder, anxiety, and

obsessive compulsive disorder." (Tr. at 29). But she further concluded that Rouner does not have

an impairment, or any combination of impairments, which meet, or equal in severity, the

requirements of any applicable SSA Listing. (*Id.*). The ALJ next assessed Plaintiff's RFC, and found

that he can perform "a full range of [unskilled] work at all exertional levels." However, she did limit

Rouner to only "occasional interaction with supervisors, co-workers, and members of the general

public[.]" (Tr. at 31). The ALJ determined that, while Plaintiff's impairments could be reasonably

expected to cause the alleged symptoms, his testimony regarding the limiting effects of his

conditions was inconsistent with the RFC assessment. (Tr. at 32). Based on Mr. King's testimony,

the ALJ found that, although Rouner has no past relevant work, he can perform such jobs as a

laundry worker, a packager, and an office cleaner, and that such work exists in significant numbers

24

in the national economy. (Tr. at 34). Ultimately, she concluded that Rouner was "not disabled," as defined by the Act, and she denied his application for benefits. (Tr. at 35). That denial prompted his request for judicial review. (Complaint, Docket Entry #1).

In this action, Plaintiff complains, first, that the ALJ denied him due process of law, because she did not allow his witnesses to testify; she scheduled the supplemental hearing at a time when his witnesses could not attend; and she improperly limited cross-examination of the vocational expert witness. (Plaintiff's Motion at 6-8). Plaintiff also alleges that the ALJ erred in finding that he failed to follow his prescribed treatment, and that she did not follow SSR 82-59, which requires her to comply with certain procedures if neglect of treatment is the basis for a denial of benefits. (*Id.* at 10). In addition, Plaintiff contends that the ALJ improperly evaluated Dr. Mohamed Ahmed's opinion, about his "inability to engage in competitive employment." (*Id.* at 13). Finally, Plaintiff argues that the ALJ's RFC assessment is not supported by substantial evidence, because she failed to determine whether he had the ability to sustain employment, even if he obtained it. (*Id.* at 13-14).

It is well settled that judicial review of the Commissioner's decision is limited to a determination of whether it is supported by substantial evidence, and whether the ALJ applied the proper legal standards in making it. *See Myers*, 238 F.3d at 619; *Newton*, 209 F.3d at 452 (citing *Brown*, 192 F.3d at 496). Any conflict in the evidence is to be resolved by the ALJ, and not the court. *See id*. A finding of "no substantial evidence" is proper only if there are no credible medical findings or evidentiary choices that support the ALJ's decision. *See Johnson*, 864 F.2d at 343-44 (quoting *Hames*, 707 F.2d at 164).

### *Due Process*

Plaintiff claims that the ALJ violated his right to due process by not allowing testimony from

his witnesses, and by restricting cross-examination of the vocational expert witness. (Plaintiff's Motion at 3). Rouner contends that the ALJ required him to limit his witness list, and that she scheduled a supplemental hearing at a time when his witnesses were unable to testify. (*Id.* at 7, 8). Plaintiff argues that, as a result, he was unable to fully present the merits of his case. (*Id.* at 8).

It is well settled that, under the Social Security Act, a claimant has a right to an administrative hearing, in which he may present evidence, have witnesses testify in his behalf, and cross-examine adverse witnesses. 42 U.S.C. A. § 405(b)(1) (West 1991); *see Lidy v. Sullivan*, 911 F. 2d 1075, 1077 (5ᵗʰ Cir. 1990). Although the hearing is informal in nature, due process requires that a claimant receive a full and fair proceeding before an impartial and unbiased hearing officer. *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed. 2d 842 (1971); *see also Pate v. Astrue*, Civ. No. H-08-249, 2009 WL 4825206 (S.D. Tex. Dec. 8, 2009). However, the ALJ must also ensure that the proceedings are conducted in an orderly and efficient manner. 20 C.F.R. § 405.320(a). For that reason, the ALJ must decide the order in which the evidence will be presented, and she may hold supplemental hearings to receive additional evidence, if necessary. *Id.*

On this record, it appears that Plaintiff's right to due process was not infringed. The ALJ suggested that Rouner truncate his witness list to avoid repetitive testimony, and she scheduled a supplemental hearing to provide time for additional testimony. (Tr. at 44, 68). Following the supplemental hearing, the ALJ left the record open for three days to allow for the submission of affidavits from Rouner's absent witnesses. (Tr. at 72).[12] In doing so, the ALJ complied with the statutory requirement set out in 20 C.F.R. § 405.320(a). Moreover, the essence of due process is the mandate that "a person in jeopardy of serious loss [be given] notice of the case against him and [an]

---

[12]It is important to note that Rouner submitted an affidavit from only one of the five witnesses that he initially listed. (Tr. at 163-166).

*opportunity* to meet it." *Mathews v. Eldridge*, 424 U.S. 319, 348-49, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (*quoting Joint Anti-Fascist Comm. v. McGrath*, 341 U.S.123, 171-72, 71 S.Ct. 624, 649, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring) (emphasis added). Plaintiff may not decline to participate fully in the adjudication of his claim, and then subsequently complain that he was denied due process.

Rouner also alleges that the ALJ improperly restricted his right to cross-examine the vocational expert witness. The ALJ and the parties, or their designated representatives, may ask witnesses any questions material to the issues. 20 C.F.R. § 416.1450(e). The ALJ must, however, ensure that the hearing is managed effectively. 20 C.F.R. § 405.320(a). While Rouner cites *Lidy v. Sullivan* in support of his argument, that case is clearly distinguishable. The record here shows that Mr. Dewberry questioned the vocational expert witness, at length, about the reasons Plaintiff purportedly could not work for up to six hours a day. In *Lidy,* however, the plaintiff  was wholly denied the opportunity to cross-examine the vocational expert witness, at all. (Tr. at 76-78, 80, 86-87); *cf Lidy*, 911 F 2d. at 1076. Further, although the ALJ limited the testimony that Plaintiff's attorney sought to elicit from the witness, those limits were entirely reasonable. In this instance, Mr. Dewberry sought to cross-examine Mr. King on each functional limitation that was listed in Dr. Ahmed's mental RFC report. (Tr. at 78). However, earlier in the hearing, the ALJ had posed the following question to the vocational expert:

Q       If an individual consistently and routinely exceeded these customary limitations for *any reason* – for example if once a week. . . they did not show up for work or when they did they lacked concentration to stay on task  for at least 80 percent of the work day, that would eliminate the jobs that you provided as, well as jobs in the competitive market place?

A       Yes, that would eliminate all jobs with those limitations. (Tr. at 75).

On this record, the ALJ could have properly determined that questioning the witness on each functional limitation in Dr. Ahmed's report would have been superfluous, as Mr. King had previously testified that Rouner was unemployable if he could not stay on task for 20 percent of the work day, for any reason. On this record, the ALJ appropriately exercised her discretion to ensure that the hearing was conducted in an efficient manner. Plaintiff has made no showing of a due process violation.

### Inability to Afford Treatment

Plaintiff argues that the ALJ erred in finding that he failed to follow his prescribed treatment, because she ignored his testimony that he could not afford to attend his appointments, or to obtain medication. (Plaintiff's Motion at 9). He also alleges that she failed to comply with SSR 82-59, which requires an ALJ to inform a claimant of the consequences of a finding of failure to follow a prescribed treatment plan. (*Id.* at 10). Rouner contends that, under these circumstances, the ALJ may not use his failure to follow a prescribed treatment plan as a reason to deny his benefits. (*Id.*).

A medical condition that can be reasonably remedied either by surgery, treatment, or medication, is not disabling under the Act. 20 C.F.R. §§ 404. 1530 (a), (b) and 416. 930(a), (b). If, however, the claimant cannot afford the prescribed treatment or medicine, and can find no way to obtain it, " the condition that is disabling in fact continues to be disabling in law." *Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987) (*quoting Taylor v. Bowen*, 782 F.2d 1294, 1298 (5th Cir. 1986)). But prior to receiving benefits, the claimant must explore all possible resources in the local community, including charitable clinics and public assistance agencies. *See* SSR 82-59, 1982 WL 31384, *4 (S.S A 1982);[13] *see also Taylor*, 782 F. 2d at 1298.

---

[13]It should be noted that SSA Rulings are not binding on the court, but they may be consulted for explanation of a statute that provides little guidance. *B.B. ex. rel. A.L.B. v. Schweiker*, 643 F.2d 1069, 1071 (5th Cir. 1981).

In this case, there is no evidence to show that all options were exhausted, or even explored, in Plaintiff's attempt to obtain treatment. In fact, Rouner has presented no evidence that he ever sought *any* free medical care. Without such evidence, the ALJ's purported failure to comply with SSR 82-59 is no reason to remand Plaintiff's request for benefits.

Moreover, the record is replete with evidence that suggests that Rouner's impairments would have been controlled had he followed appropriate medical care. Dr. Ahmed repeatedly instructed Plaintiff to take his medications, as prescribed, to consult a psychotherapist, to follow-up regularly, to increase his physical activity, to decrease his stress level, and to join a support group. (Tr. at 252, 257, 258, 264-65, 267, 273, 276). But Rouner consistently failed to follow Dr. Ahmed's instructions.[14] Further, Plaintiff reported that his anxiety and panic attacks were controlled with the free medication samples that he received from Dr. Ahmed, but he failed to maintain those prescriptions. (*See* Tr. at 267, 270, 271, 273, 274). Similarly, Dr. Anderson, an examining physician, concluded that Rouner's mental health issues would improve with regular treatment. (Tr. at 286).

It is without dispute that procedural improprieties alleged by a social security claimant constitute a basis for remand "only if such improprieties would cast into doubt the existence of substantial evidence to support the ALJ's decision." *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988). On this record, the ALJ did not err in not strictly following SSR 82-59. There is substantial evidence to support her conclusion that Plaintiff failed to follow his prescribed treatment. Indeed, "procedural perfection in administrative proceedings is not required." *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988).

### *Treating Physician*

Plaintiff claims that the ALJ improperly evaluated the opinion from Dr. Mohamed Ahmed, his treating psychiatrist, which allegedly spoke to his "inability to engage in competitive

---

[14]While Plaintiff contends that he is unable to afford his prescribed treatment, he could have increased his physical activity, joined a support group, and decreased his stress level without incurring any costs.

employment." (Plaintiff's Motion at 13). Rouner contends that the ALJ considered only "two[, ]of the five[,]" factors required by the SSA regulations, and that she failed to provide sufficient reasons for disregarding Dr. Ahmed's opinion. (*Id.* at 12, 13). Plaintiff insists that the medical evidence, as a whole, supports that opinion, which should have been given controlling weight in the ALJ's disability determination. (*Id.* at 13).

A physician is a "treating source" if the claimant sees that doctor "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition(s)." *See* 20 C.F.R. § 404.1502. It is well established that an ALJ cannot reject a treating source's opinion without identifying specific, legitimate reasons to do so. *See Schwartz v. Barnhart*, 70 Fed. Appx. 512 (10th Cir. 2003)."Good cause" for rejecting a treating source opinion may exist when the treating physician's statements are "brief and conclusory, not supported by medically acceptable clinical laboratory diagnostic techniques, or otherwise unsupported by the evidence." *Myers*, 238 F.3d at 62l; *see Greenspan*, 38 F.3d at 237; *see also Newton*, 209 F.3d at 456. But Fifth Circuit precedent is clear that:

> A finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. *Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927.* In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted even if it does not meet the test for controlling weight.

*Id.* (quoting SSR 96-2p). For that reason, a claimant is entitled to a remand if the ALJ rejects, or gives little weight to, a treating doctor's opinion, without considering each of the factors set out in the Social Security regulations[15]. *See Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 456.

---

[15] Those factors are as follows:
   (1) the physician's length of treatment of the claimant;
   (2) the physician's frequency of examination;
   (3) the nature and extent of the treatment relationship;

In this case, the ALJ did, in fact, complete the six-factor analysis set out in 20 C.F.R. § 416.927(c). At the outset, the ALJ underscores that Dr. Ahmed is a psychiatrist. (Tr. at 33); 20 CFR § 416.927(c)(5)(discussing weight given to opinion of a specialist about medical issues related to speciality). She determined, however, that Dr. Ahmed's mental RFC assessment is entitled to little weight, because it is inconsistent with his other treatment records. (*Id.*); *see* 20 C.F.R. § 416.927(c)(3) (addressing the supportability of medical opinions). She also found that there were significant gaps in Plaintiff's treatment, as Dr. Ahmed had not seen him in the two years before he compled the RFC assessment. (Tr. at 33); *see* 20 C.F.R. § 416.927(c)(i-ii) (discussing the length, nature, and extent of treatment relationship, and frequency of examination). Further, the ALJ determined that Dr. Ahmed's opinion is at odds with Rouner's own reported capabilities. (Tr. at 33, 238-39, 358); s*ee* 20 C.F.R. § 416.927(c)(4) (importance of examining consistency of opinion with record as a whole). Here, in considering the record as a whole, the ALJ was free to reject Dr. Ahmed's findings regarding Rouner's RFC, and she did so in accordance with the law. On this record, a remand on this issue is not required.

### *Ability to Maintain Employment*

In his final argument, Rouner contends the ALJ's RFC assessment is not supported by substantial evidence, because she failed to determine whether he had the ability to sustain employment, if he acquired it. (Plaintiff's Motion at 13-14). Plaintiff claims that, in all cases involving a mental impairment, the ALJ must consider the claimant's ability to sustain employment. (*Id.* at 14). Rouner is adamant that, while he may have the ability to obtain employment, his impairments would prevent him from maintaining it. (*Id.*).

---

(4) the support of the physician's opinion afforded by the medical evidence of record;
(5) the consistency of opinion with the record as a whole; and
(6) the specialization of the treating physician.
*Newton*, 209 F.3d at 456; *see Myers*, 238 F.3d at 621; 20 C.F.R. § 404.1527(d)(2)-(6).

The Fifth Circuit has made clear that an ALJ is not required in every case to make a separate finding that a social security claimant who is capable of performing a job, will also be able to maintain that job. *See Perez v. Barnhart*, 415 F.3d 457, 465 (5th Cir. 2005); *Frank v. Barnhart*, 326 F.3d 618, 619 (5th Cir. 2003). However, the court has observed that, "[n]evertheless, an occasion may arise . . . where the medical impairment, and the symptoms thereof, is of such a nature that separate consideration of whether the claimant is capable of maintaining employment is required." *Id.* (citing *Watson v. Barnhart*, 288 F.3d 212, 217-18 (5th Cir. 2002)). Such a circumstance arises if, "by its nature, the claimant's physical ailment waxes and wanes in its manifestation of disabling symptoms." [7] *Id.* at 9. Mere evidence of "good days and bad days," however, does not of itself establish an impairment sufficient to require an explicit finding on ability to maintain employment. *See Perez*, 415 F.3d at 465.

Rouner cites *Singletary v. Bowen* in support of his contention that the ALJ was required to make a specific finding regarding his ability to maintain employment. 798 F.2d 818 (5th Cir. 1986); (Plaintiff's Motion at 14). The facts in *Singletary*, however, are significantly different from those presented here. For more than ten years, Singletary was an itinerant worker, who spent a substantial period living in hospitals, bus stations, missions, outdoors, and relatives' homes. *Singletary*, 798 F.2d at 820. He was ultimately diagnosed as suffering from numerous severe mental illnesses, including schizophrenia, various psychoses, delusions, antisocial personality disorder, inadequate personality disorder, and passive-aggressive personality disorder. *Id.* At his disability hearing, Singletary stated that he had never been able to hold a job for an extended period of time, and that even his relatives declined to employ him. *Id.* at 822. Singletary's examining physicians found that he had poor judgment and insight, antisocial tendencies, and that he was unable to relate in social

---

[7] The *Frank* court stated, "For example, if Frank had alleged that her degenerative disc disease prevented her from maintaining employment because every number of weeks she lost movement in her legs, this would be relevant to the disability determination." 326 F.3d at 619.

situations. *Id.* An examining physician stated, specifically, that "it is doubtful that [Singletary will] be able to return to employment." *Id.* After reviewing the medical evidence, the *Singletary* court found that, there was no substantial evidence to support a determination that the plaintiff could obtain and maintain employment. *Id.* at 823.

In this case, Plaintiff points to no specific medical evidence to show that his symptoms wax and wane in severity, and he refers only to the "medical evidence as a whole[.]" (Plaintiff's Motion at 14). The severity of Rouner's symptoms pales in comparison to those experienced by the claimant in *Singletary*. While Rouner reported experiencing difficulty in leaving his home, Singletary was intermittently institutionalized over a ten year period. Moreover, during his treatment by Dr. Ahmed, Rouner reported decreased anxiety levels, and substantial improvement in his panic attacks. (Tr. at 256, 265, 271, 274). Likewise, Dr. Lankford noted no episodes of decompensation, at all. (Tr. at 297). It is also important to stress that, in *Singletary*, the claimant's examining physician found, specifically, that he had trouble maintaining jobs because of his impairments. 788 F.2d at 822. In this case, no credible medical evidence indicates that Plaintiff cannot acquire or maintain work.

In sum, the ALJ's conclusion that Plaintiff is not disabled is supported by substantial evidence. The court recommends that Defendant's motion for summary judgment be granted, and that Plaintiff's motion for summary judgment be denied.

**Conclusion**

Based on the foregoing, it is **RECOMMENDED** that Commissioner Carolyn W. Colvin's Motion for Summary Judgment be **GRANTED**, and that Plaintiff's Motion for Summary Judgment be **DENIED**.

The Clerk of the Court shall send copies of the Memorandum and Recommendation to the respective parties, who will then have fourteen business days to file written objections, pursuant to

28 U.S.C. § 636(b)(1)(c), General Order 02-13, S.D. Texas. Failure to file written objections within the time period provided will bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas, 77208; copies of any such objections shall be delivered to the chambers of Judge Lee H. Rosenthal, Room 11535, and to the chambers of the undersigned, Room 7007.

**SIGNED** at Houston, Texas, this 4th day of March, 2015.

**MARY MILLOY**
**UNITED STATES MAGISTRATE JUDGE**